# COURT OF APPEALS OF VIRGINIA

---

**Record No. 0608-25-2**

---

STEPHANAS RENNICK

v.

COMMONWEALTH OF VIRGINIA

---

Present: Judges AtLee, Ortiz and Senior Judge Humphreys

Argued at Richmond, Virginia

Opinion Issued August 4, 2026*

---

**FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY**
Ricardo Rigual, Judge

Joseph R. Pricone (Joseph R. Pricone, PLLC, on brief), for appellant.

Timothy J. Huffstutter, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

---

**MEMORANDUM OPINION BY
<u>JUDGE ROBERT J. HUMPHREYS</u>**

A jury convicted Stephanas Rennick of felony hit and run, in violation of Code

§ 46.2-894.  The circuit court sentenced Rennick to 10 years' incarceration, with 9 years and 6

months suspended.  On appeal, Rennick claims the circuit court erred by not allowing him to

admit certain evidence.  He also challenges the sufficiency of the evidence to sustain his

conviction.

---

\* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

## BACKGROUND[2]

On May 31, 2022, Rennick was driving his father's silver 2014 Hyundai Azera (the Hyundai Azera) on a four-lane highway just after 11:00 p.m. when he struck a pedestrian, later identified as Keith Ballard. The impact killed Ballard. Rennick called his father and said, "he had hit something." Rennick's father advised him to come home to assess the damage. Rennick left the scene of the collision and returned home.

Nathaniel Hendricks was riding his bike to work that night when he came across Ballard's body in the road. Hendricks called 911. Spotsylvania Sheriff's Deputies Stephen Hansinger and Christopher Brooks went to the scene in response to the call. When they arrived, there were numerous emergency vehicles and personnel present. There was debris on the ground from the Hyundai Azera, and Ballard's body was lying "near the edge of the roadway." Hansinger collected car parts from the debris and took them to a Hyundai dealership to ascertain the year and model of the car that was involved. With the help of the dealership staff, Hansinger learned that the car was likely "an early 2010 model Hyundai Azera" in a silver color.

The following day, the Spotsylvania Sheriff's Office issued a press release concerning the identity of a "driver who left the scene of a fatal pedestrian crash." The press release advised that the Sheriff's Office believed that the car involved was a "2012-2013 Silver Hyundai Azera with significant front end and passenger side damage." On June 2, 2022, after Rennick was alerted to the press release, he went to the police to acknowledge his involvement in the incident.

---

[2] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, we discard any evidence that conflicts with the Commonwealth's evidence, and regard as true all the credible evidence favorable to the Commonwealth and all inferences that can be fairly drawn from that evidence. *Cady*, 300 Va. at 329.

Rennick arrived at the Sheriff's Office where Deputies Brooks and Hansinger interviewed him. Rennick said it was dark out and that "out of nowhere" he hit a black "object." He could not "make out what it [was]" that he had hit. He made a "U-turn" and went back to look for what he had hit. He got of his car and searched for about "five minutes," but did not "see anything" so he left and went home. Hansinger left during the interview and went to Rennick's house to seize the Hyundai Azera. It was parked in front of Rennick's house, where Rennick had left it the night of the accident. Hansinger had it towed and delivered to the Sheriff's Office where Detective Doug Perkins processed it for forensic analysis. Following Rennick's interview, he was arrested and charged with leaving the scene of an accident.

An autopsy of Ballard's body was performed, which included a toxicological analysis. At the time of the analysis, Ballard's blood content contained 0.44 milligrams per liter (mg/L) of Phencyclidine (PCP) and .0012 mg/L of THC. Rennick intended to introduce the toxicology report and call an expert witness to testify that the toxicology analysis indicated "an extremely high level of PCP" in Ballard's blood that would have had an intense intoxicating effect and could have caused him to act erratically.

Before trial, the Commonwealth moved to exclude evidence of the toxicology report.[3] At the hearing, the Commonwealth argued that Ballard's blood content was irrelevant because there was no issue as to the cause of the impact.[4] The Commonwealth's case was not premised on Rennick driving recklessly or unsafely when the impact occurred. Thus, the Commonwealth argued "hypothetically" that if Ballard, intoxicated by PCP, "had sprinted out in front of [Rennick's] vehicle," Rennick still "would be facing the exact same criminal charge." The only issues in the

[3] There were two previous mistrials, and the Commonwealth filed a motion to exclude the toxicology report in each of those trials, which the circuit court granted.

[4] The hearing on the motion occurred before the first trial. The circuit court upheld its *in limine* ruling for each subsequent retrial.

case concerned Rennick's actions after the impact. The Commonwealth argued that there was no evidence that Ballard's intoxicated state had any causal effect on the incident and that Rennick's theory was speculative.

Rennick agreed that "the one element that is in true dispute here is whether the defendant knew or should have known that his accident involved . . . another person." He proposed that Ballard's intoxication was relevant because it informed Rennick's expectation that a pedestrian was in the road at that location at that time. He argued that someone would not expect a pedestrian to be present there, but Ballard's intoxication possibly caused him to enter the roadway. Rennick asserted that when he struck something, turned around to search for it and did not find anything, it was reasonable to assume it was not a person. According to Rennick, the evidence of Ballard's intoxication "makes it more likely that" Ballard was "in an area where you wouldn't expect a pedestrian to be," thus "it's relevant to . . . whether" he had "notice that [he] hit another person."

The circuit court conceded that "you wouldn't expect a person to be" where Ballard was hit. It also acknowledged the Commonwealth's concession that Rennick "didn't anticipate that someone would be in the road." But it did not matter how Ballard ended up in the road because the Commonwealth's burden of proving the case depended on whether Rennick failed to meet obligations imposed by Code § 46.2-894 after the impact. Finding the toxicology report to be immaterial and irrelevant, the circuit court granted the Commonwealth's motion.

At trial, Rennick acknowledged that the only contested issue was "whether or not he knew he had hit a person." Hansinger testified that he went to the accident scene "shortly after midnight." The road had recently been "repaved," and was "[r]ather devoid" of lighting in the area of the incident. Hansinger arrived at the site with his headlights "illuminated" and could "clearly see . . . [a]ll four lanes" of the road. He recalled his process of investigating the accident scene. The Commonwealth entered photos of the scene that Hansinger had taken. The photos included images

- 4 -

of Ballard and the surrounding "debris field." Ballard's hat and one of his shoes were in the middle of the road. Pieces of the Hyundai Azera's bumper, right fender, fog lights, and sideview mirror were scattered along the road.

Detective Perkins testified to processing the Hyundai Azera for forensic analysis. He had photographed the Hyundai Azera; the Commonwealth entered the photos into evidence. The passenger side of the car had significant damage. The hood and fender had a large "concave" dent. The passenger side of the windshield was smashed. The sideview mirror was missing. And the passenger-side rear window was broken out. Perkins acknowledged that from visual observation alone, there was no indication of hair or blood on the vehicle, except for a "very faint . . . red stain" near the rear passenger window.[5] He also conceded that there was no indication that anyone had tried to "clean" the car.

Brooks testified that he received a call about the incident around 11:15 p.m. As he neared the location, it was "dark," but he could see "all four lanes" of the road with his headlights on. He agreed that the general area around the accident was "void" of lighting. Brooks recalled Rennick arriving at the Sheriff's Office with his attorneys two days after the incident. Brooks "brought him up to a room upstairs in [the] criminal investigation division" and "conducted an interview." Brooks recorded the interview on a body camera. The recording of the interview was entered into evidence and published to the jury.

Detective Hanrahan, a cell site geolocation specialist, testified concerning the location of Rennick's cell phone during the incident. Hanrahan presented a power point displaying the path of Rennick's phone from shortly before the accident to the following morning. Hanrahan's analysis

---

[5] Employees with the Virginia Department of Forensic Science found trace evidence of DNA on the vehicle and matched it to Ballard's blood sample from his clothing. They also determined the car parts found at the accident scene to be a "fracture match" with the Hyundai Azera and found glass fragments from the Hyundai Azera on Ballard's clothing and body.

determined that Rennick's phone was located at an intersection about "300 feet" from the accident scene "after midnight," while emergency personnel were investigating the incident.

Rennick stipulated to the entry of Ballard's autopsy report into evidence, which characterized his injuries as "significant trauma . . . consistent with impact from being struck by a car." He also moved to enter the toxicology report, arguing that the Commonwealth had "opened the door" to its admission by entering the medical examiner's autopsy report. He argued that the autopsy report "references the toxicology report." Thus, "they have opened the door by introducing essentially an incomplete report [] that entitles the defendant to introduce the toxicology report." The circuit court found that the reference in the autopsy report simply stated that a toxicology test was performed and therefore did not "open the door to" the admission of the toxicology report itself under the doctrine of curative admissibility.

Rennick's father testified that Rennick called him right after the accident and said "he had hit something," but "didn't know what he hit." Rennick was "[h]ysterical . . . because it was [his father's] vehicle," who is "very meticulous when it comes to things and possessions." Rennick put his father on a video call to "show" him as he "walk[ed] in the area" of the accident. "Unfortunately[,] it was extremely dark," so he told Rennick to just come home. Rennick went home and parked the Hyundai Azera "in front of the house." The following day, Rennick's father learned of the Sheriff's press release concerning the accident and notified Rennick.

Rennick testified that he was travelling in the right lane at a speed of about "45-ish" miles per hour. "[T]hen something hit[] [his] windshield and [he] had no idea what it [was]." The windshield "spider[ed] like a web," and he "realize[d] that something impacted it." It took Rennick "three to five" seconds to "even process" what was "going on." He "took [his] foot off the gas and slowed down appropriately and made a U-turn" to go back and see what he had hit. He was sure "it wasn't another vehicle, and [he] didn't see any pedestrians." When he made the U-turn, he

- 6 -

considered how long it had taken him to come to a stop and he drove back for about "the same three to five seconds." As he drove back to where he believed the impact occurred, he did not see any of the debris from his vehicle or Ballard's body. He parked and exited his car; he searched for about "ten minutes" but found nothing. "It was a dark night," and he "didn't see anything that gave a sign as to what [he] hit." He determined, well after "reviewing all the evidence," that he had not driven all the way back to "the point of impact" and had "parked too far" away when he started searching.

After Rennick drove home and parked in front of the house, a friend of his picked him up and they went to her house. Along the way, they drove through an intersection near the accident scene. Rennick saw "a fire truck with a ladder and lights" near where he impacted Ballard. At the time he thought "something fell off of the [power] lines or something and that's what hit [his] vehicle." As he passed by, he presumed that "somebody" was "up there on the line" addressing whatever had fallen.

Rennick entered a recording of the body camera footage from the officer that interviewed Hendricks immediately after he called 911. Hendricks said he initially "didn't even realize it was a body" and thought it might be a "bump in the road or a deer" when he came upon Ballard. He further stated that he almost "clipped" Ballard's feet and didn't see the shoe in the road, "that's how dark this road is. They need to put lights on it."

Rennick moved to strike the evidence arguing it was insufficient to show he knew or should have known he hit a person. The circuit court denied his motion. The jury convicted Rennick for leaving the scene of an accident that caused a death. This appeal followed.

ANALYSIS

I. Sufficiency of the Evidence

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The

judgment of the circuit court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Rennick argues that the evidence failed to prove that he had "the requisite knowledge that his vehicle had injured or killed a person." In support, he highlights the evidence that it was "extremely dark" and Ballard was wearing dark clothing. He emphasizes that the accident occurred "in a location where a driver would [not] expect a pedestrian to be." Finally, he asserts that his "actions after the impact also support a lack of knowledge." He lauds his communication with his father, his lack of attempt to conceal the damage to his car, and his forthcoming admission to the police "within 48 hours of the accident" as evidence of his lack of knowledge.

> The driver of any vehicle involved in an accident in which a person is . . . injured . . . shall immediately stop as close to the scene of the accident as possible without obstructing traffic . . . and report his name, address, driver's license number, and vehicle registration

number forthwith to the [s]tate [p]olice or local law-enforcement agency, to the person struck and injured . . . or to the driver . . . of the vehicle collided with . . . . The driver shall also render reasonable assistance to any person injured . . . . Any person convicted of a violation of this section is guilty of (i) a Class 5 felony if the accident results in injury to . . . any person, or if the accident results in more than $1000 of damage to property.

Code § 46.2-894. The hit and run statute "imposes three categories of obligations" on the driver of a vehicle involved in an accident. *Evans v. Commonwealth*, 82 Va. App. 612, 625 (2024). It imposes a duty to stop, report information to certain individuals, and render reasonable aid to injured persons. *Id.* at 625-26. "The prosecution 'can establish [a defendant's] guilt by proving [that the defendant] failed to perform any one of [those three] duties.'" *Id.* at 626 (alterations in original).

"Knowledge necessarily is an essential element" for the Commonwealth to prove a violation of the hit and run statute. *Brannon v. Commonwealth*, 52 Va. App. 800, 804 (2008) (quoting *Herchenbach v. Commonwealth*, 185 Va. 217, 220 (1946)); *Evans*, 82 Va. App. at 635. The knowledge element may be established by proof "that the defendant possessed actual knowledge of the occurrence of the accident, and such knowledge of injury which would be attributed to a reasonable person under the circumstances of the case." *Brannon*, 52 Va. App. at 804 (quoting *Neel v. Commonwealth*, 49 Va. App. 389, 395 (2007)). This requires "subjective knowledge of the collision," and holds the driver to the "stricter reasonable [person] standard as to the fact" that injury occurred. *Evans*, 82 Va. App. at 635 (quoting *Kil v. Commonwealth*, 12 Va. App. 802, 810 (1991)). "Knowledge of injury may be imputed to a driver 'where the fact of personal injury is visible or where the seriousness of the collision would lead a reasonable person to assume there must have been resulting injuries.'" *Id.* at 636 (quoting *Neel*, 49 Va. App. at 395).

There is no dispute that the subject section of road here was "void" of light when Rennick struck Ballard. But Hansinger and Brooks both testified that when they approached the scene in their separate patrol cars, they could see the entirety of the four-lane highway clearly with their headlights and they readily located the location of the accident from the "debris field" in the road, which included damaged parts from Rennick's vehicle and articles of clothing from the victim. Rennick had his headlights on. He was able to safely do a U-turn and never saw "any other drivers com[e] by." He also admitted that after he did a U-turn, he did not drive all the way back to "the point of impact." From this, the jury reasonably could infer that Rennick did not "immediately stop as close to the scene of the accident" as safely possible. *Commonwealth v. Wilkerson*, 304 Va. 92, 100 (2025) ("Reasonable inferences drawn by the factfinder 'cannot be upended on appeal.'" (quoting *Commonwealth v. Perkins*, 295 Va. 323, 332 (2018))).

Moreover, the damage to Rennick's car was significant. It included a large dent on top of the hood and the windshield was smashed like a "spider . . . web" from top to bottom. Ballard impacted the windshield in Rennick's "direct line of sight." From this, the jury could also reasonably infer that Rennick was aware that a person came over the top of his hood and smashed into his windshield. *Wilkerson*, 304 Va. at 101. The jury was not required to accept Rennick's version of events, and "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)).

Rennick's actions of coming forward after a press release, two days after the incident, do little to demonstrate his lack of awareness; he was at an intersection 300 feet from the accident scene within an hour of the incident. There were numerous emergency vehicles present with lights flashing at that time. From this, coupled with the surrounding circumstances of the impact and

significant damage to his car, the jury was permitted to impute knowledge to Rennick that he caused personal injury. *Evans*, 82 Va. App. at 636. We will not disturb the jury's finding because whether or not a person acted reasonably under the circumstances is a question of fact for the jury and only "whe[re] reasonable minds could not differ [on a factual issue]" can we say the circuit court erred "in submitting the issue to the jury." *Ravenwood Towers, Inc. v. Woodyard*, 244 Va. 51, 57-59 (1992); *Virginia Transit Co. v. Durham*, 190 Va. 979, 995 (1950).

## II. Toxicology Report

Determining the "'admissibility of evidence is within the discretion of the trial court,' and an appellate court will not reject such decision absent an 'abuse of discretion.'" *Williams v. Commonwealth*, 71 Va. App. 462, 487 (2020) (quoting *Tirado v. Commonwealth*, 296 Va. 15, 26 (2018)). "In this context, 'we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action.'" *Bista v. Commonwealth*, 303 Va. 354, 370 (2024) (quoting *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Id.* (quoting *Commonwealth v. Swann*, 290 Va. 194, 197 (2015)).

Rennick argues that the toxicology report was relevant to his defense, so the circuit court erred in denying its admission into evidence. He contends that the report was relevant because "[h]ow the accident occurred" was "material" to whether or not he "knew, or should have known," that Ballard was present and injured. Rennick claims that if "Ballard entered the roadway unannounced and without notice, it is less likely that" Rennick "knew or should have known that his vehicle impacted a person." Rennick also argues that the Commonwealth "opened the door" to admitting the toxicology analysis because the autopsy report stated that a "postmortem toxicology" was "performed" and therefore he was "entitled to . . . introduc[e] the full report."

- 11 -

A. The circuit court properly found that the toxicology report was irrelevant.

"Evidence is admissible if it is both relevant and material." *Castillo v. Commonwealth*, 70 Va. App. 394, 462 (2019) (quoting *Patterson v. Commonwealth*, 62 Va. App. 488, 493 (2013)). "Evidence is relevant if it has any logical tendency, however slight, to establish a fact at issue in the case." *Id.* (quoting *Cousins v. Commonwealth*, 56 Va. App. 257, 271 (2010); Va. R. Evid. 2:401. Evidence is material "if it relates to a matter properly at issue." *Castillo*, 70 Va. App. at 462.

At the hearing on the Commonwealth's motion *in limine*, Rennick acknowledged that the only disputed issue was his knowledge that a person had been injured by the accident. Similarly, the circuit court opined that the only matter properly at issue was whether Rennick had an affirmative duty to stop and report the accident and render reasonable assistance "immediately following" the accident. "There [was] no suggestion that [Rennick] could or should have avoided" the collision, or "that he was negligent in causing the collision." Thus, the circuit court found no link between Rennick's theory—that Ballard's intoxication possibly caused him to act erratically and thereby end up in the road—and Rennick's duty to stop and report following the impact.

The hit and run statute imposes an affirmative set of duties on a driver "involved" in an accident. Code § 46.2-894. The purpose of Code § 46.2-894 is "to prevent motorists involved in accidents from evading civil or criminal liability by leaving the scene of an accident." *Smith v. Commonwealth*, 66 Va. App. 382, 390 (2016). "It is the flight from the scene, and the failure to give the information required to the person in charge of the property damaged or succor to the injured which constitute the completed offense." *Tooke v. Commonwealth*, 47 Va. App. 759, 765-66 (2006) (quoting *James v. Commonwealth*, 178 Va. 28, 37 (1941)). The nature of the circumstances causing an accident are "of no consequence" to a violation of the hit and run

- 12 -

statute. *See id.* at 767 (finding that the reason the defendant drove into a lane of oncoming traffic was not relevant to his failure to stop, report, and render aid when he caused another car to run off the road). Put more succinctly, the victim of a hit and run can be entirely at fault in causing an accident, but that simply doesn't matter since the law imposes a duty to *all* drivers involved in a motor vehicle accident to stop, at or very near the scene, report certain identifying information to law enforcement officials and, in the case of an injury, render assistance to the injured party if practicable. The toxicology report had no bearing on Rennick's compliance with any of these statutory requirements.

Because the record supports the trial court's finding that evidence of Ballard's intoxication did not have "any logical tendency . . . to establish a fact at issue in the case" or "relate to a matter properly at issue," we find no abuse of the trial court's discretion. *Castillo*, 70 Va. App. at 462; *Bista*, 303 Va. at 370 ("[W]e consider only whether the record fairly supports the trial court's action.").

B. The Commonwealth did not "open the door" to admission of the toxicology report.

"The term 'opening the door' is a catchphrase often used to refer to the doctrine of curative admissibility." *Elliott v. Commonwealth*, 267 Va. 396, 417 (2004); *Wright v. Commonwealth*, 23 Va. App. 1, 8 (1996) (en banc). It "allows a party to introduce otherwise inadmissible evidence when necessary to counter the effect of improper evidence previously admitted by the other party." *Wright*, 23 Va. App. at 7. This Court's decision in *Wright* is dispositive of Rennick's argument here. In *Wright*, we held that "a trial court has no discretion to apply the doctrine of curative admissibility if the party seeking to invoke it intentionally failed to object to the inadmissible evidence in order to gain admission of otherwise inadmissible evidence." *Id.* at 9.

- 13 -

The autopsy report here included a bare reference that a toxicology analysis had been performed; it did not allude to the results of the toxicology analysis. In making its *in limine* ruling, the circuit court clearly intended to exclude evidence that "the victim in this case was high at the time the collision occurred." Admitting the toxicology report would have wrongly "suggested to the jury" that Ballard's intoxication "was somehow relevant and material to the charge" that Rennick left the scene of the accident. *Wright*, 23 Va. App. at 8.

Furthermore, Rennick did not object to the admission of the autopsy report and stipulated to its admission with no reservations. The Commonwealth was surprised by Rennick's argument that it had "opened the door" to the toxicology report's admission. "To the extent that" a bare reference that a toxicology was performed violated "the *in limine* order, whether inadvertently or purposely, appellant was not relieved of the responsibility of objecting to that evidence."[6] *Wright*, 23 Va. App. at 9-10.

## CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*

---

[6] We note that the record in *Wright* included an affirmative admission by counsel that "[h]e intentionally failed to object to [the] testimony in order to attempt to gain admission of the description contained in the affidavit." 23 Va. App. at 9. Though we do not have such a direct admission from Rennick, the record indicates that he purposely failed to object to the autopsy report or its reference to the toxicology analysis as a tactic to seek admission of the analysis showing evidence of Ballard's intoxication. "If trial tactic is the purpose for a party declining to timely object to inadmissible evidence, that party will not be heard to complain that he or she is unable to introduce other evidence of the same character." *Id.* at 9 n.5.